# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| THE STATE OF DELAWARE INSURANCE COVERAGE OFFICE, and FACTORY MUTUAL INSURANCE CO., both as subrogee of the University of Delaware, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | C.A. No. N19C-08-080 EMD CCLD |
| | ) | |
| DISABATINO CONSTRUCTION CO., SCHLOSSER & ASSOCIATES MECHANICAL CONTRACTORS, INC., AND V.E. GUERRAZZI, INC., | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

Submitted: December 21, 2021
Decided: March 17, 2022

*Upon Defendant DiSabatino Construction Co.'s Motion for Summary Judgment*
***GRANTED***

*Upon Defendant Schlosser & Associates Mechanical Contactors' Motion for Summary Judgment*
***GRANTED***

*Upon Defendant V.E. Guerrazzi, Inc.'s Motion for Summary Judgment*
***GRANTED***

Allison McCowan, Esq., Sarah Fruehauf, Esq., Zi-Xiang Shen, Esq., State of Delaware Department of Justice, Wilmington, DE, *Counsel for State of Delaware Insurance Coverage Office*

Timothy Jay Houseal, Esq., Jennifer M. Kinkus, Esq., Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, *Counsel for Factory Mutual Insurance Company*

Seth A. Niederman, Esq., Fox Rothschild LLP, Wilmington, DE, *Counsel for DiSabatino Construction Company*

Michael J. Follet, Esq., Naulty, Scaricamazza & McDevitt, L.L.C., Wilmington, DE, *Counsel for Schlosser & Associates Mechanical Contractors*

Kenneth M. Doss, Casarino Christmas Shalk Ransom & Doss, P.A., Wilmington, DE, *Counsel for V.E. Guerrazzi, Inc.*

**DAVIS, J.**

## I.    INTRODUCTION

This is a breach of contract and negligence action assigned to the Complex Commercial Litigation Division of this Court.  Plaintiffs State of Delaware Insurance Coverage Office and Factory Mutual Insurance Company (collectively, "Plaintiffs") filed this action as subrogees of the University of Delaware (the "University").  Plaintiffs seek to recover insurance payments relating to a fire allegedly caused by Defendants DiSabatino Construction Company ("DiSabatino"), Schlosser & Associates Mechanical Contractors ("Schlosser"), and V.E. Guerrazi, Inc. ("Guerrazi," and collectively, "Defendants"), who were working for the University as contractors.

Defendants have each moved for summary judgment.  Defendants contend they entered into a contract with the University that included a waiver of subrogation, which bars all Plaintiffs' claims.  For the set forth below, the Court **GRANTS** the motions for summary judgment.

## II.    BACKGROUND

### A.  THE PARTIES

The State of Delaware Insurance Coverage Office is a state agency serving as a property liability carrier for all state-owned property.[1]  Factory Mutual Insurance Company is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.[2]  Plaintiffs reimbursed the University of Delaware in the amounts of $2.5 million and $2.75 million, respectively, for damages related to the fire at McKinly Hall.[3]  Plaintiffs are subrogated to the University's rights to the extent of these payments.[4]

---

[1]   Cmpl. at ¶ 1 (D.I. No. 1).
[2]   *Id.* at ¶ 2.
[3]   *Id.* at ¶¶ 19–20.
[4]   *Id.*

1

DiSabatino, Schlosser, and Guerrazzi are Delaware corporations that provided contracting services for the University in 2017.[5] DiSabatino was the general contractor on the project to renovate Lab 46 in McKinly Hall (the "Project"), Schlosser was the subcontractor, and Guerrazzi was the sub-subcontractor.[6]

## B. THE PROJECT

In May 2017, the University invited DiSabatino to bid on the Project.[7] At the time, the University and DiSabatino had a good relationship due to DiSabatino's previous work on the University's projects.[8]

The University created a 424-page specifications manual (the "Specifications") as a "road map" of the Project for potential bidders.[9] The Specifications detailed the technical requirements for the Project and provided instructions for submitting bids.[10] Although the Specifications were not a contract itself, the University expected contractors to follow the Specifications to properly complete the Project.[11] According to the record, documents like the Specifications are "standard practice" in the construction industry.[12]

The Specifications state that the successful bidder "will be required to enter into" the "Contract" and that the "[o]ther forms which shall be used under this contract are noted in the General, Supplementary, and Special Conditions and/or included as part of the Specifications."[13] Later, in a section titled "Contract," the Specifications charge bidders to "[u]se A101 2007 and

---

[5]  *Id.* at ¶¶ 5–7.
[6]  *Id.*
[7]  DiSabatino's Mot. for S.J., Ex. 3 at 13:11–13 (Dep. Transcript of Joseph T. Laws, III).
[8]  *Id.*, Ex. 2 at 44:9–16 (Dep. Transcript of Lawrence J. DiSabatino).
[9]  *See id.*, Ex. 6 at 72:21–73:3 (Dep. Transcript of Joseph Farah)
[10]  *See id.*, Ex. 6 at 69:1–72:20.
[11]  *See id.*, Ex. 6 at 73:4–73:19.
[12]  *See id.*, Ex. 6 at 71:6–71:9.
[13]  *Id.*, Ex. 5 at PLF000468 (Specifications Manual).

A201 2007 with the following supplemental information."[14] A101 2007 and A2 2007 refer to form construction contracts published by the American Institute of Architects. A101–2007 is the Standard Form of Agreement Between Owner and Contractor ("A101") and A201-2007 is the General Conditions of the Contract for Construction ("A201"). The Specifications then provide for a "Supplement to the Standard Form of Agreement, AIA A101-2007," which details the University's line-by-line revisions to the A101. The Court will collectively refer to the contract documents listed in the Specifications (*i.e.*, the A101, A201, and Supplement) as the "AIA Contract." The Court notes that A201 of the AIA Contract, as detailed below, includes a waiver of subrogation.

Marcia Hutton, the University's Director of Planning and Project Delivery, testified that the University had historically used a "short form" contract for its construction projects.[15] The short form contract was three pages long and included the A201 and a pre-drafted supplement.[16] At some point, the University transitioned to using the combination of the A101, A201, and Supplement described in the Specifications.[17] DiSabatino regarded the A101, A201, and Supplement as the University's "standard procedure."[18]

DiSabatino reviewed the Specifications[19] and submitted its bid on May 19, 2017.[20] DiSabatino's bid used a form included in the Specifications.[21] DiSabatino's bid was $125,300.[22] The University awarded DiSabatino the contract via email on May 31, 2017.[23] The University

---

[14]  *Id.*, Ex. 5 at PLF000479.
[15]  *Id.*, Ex. 4 at 60:2–60:21 (Dep. Transcript of Marcia Hutton).
[16]  *Id.*, Ex. 4, at 60:16–60:21.
[17]  *Id.*, Ex. 4, at 60:22–61:2.
[18]  *Id.*, Ex. 7, at 27:20–28:2 (Dep. Transcript of Jeffrey P. DiSabatino).
[19]  *Id.*, Ex. 3 at 14:19–24.
[20]  *Id.*, Ex. 8 (Bid Form Dated May 19, 2017); *id.*, Ex. 3 at 15:11–15:19; *id.*, Ex. 6 at 74:22–75:4.
[21]  *Id.*
[22]  *Id.*, Ex. 8.
[23]  *Id.*, Ex. 9 (Email Dated May 31, 2017); *id.*, Ex. 6 at 84:19–85:1.

confirmed its acceptance of DiSabatino's bid on June 27, 2017, with a revised contract value of $126,400.[24]

### C. DEFENDANTS WORK ON THE PROJECT AND THE FIRE OCCURS

The University needed the Project to be completed before students returned in Fall 2017.[25]  The University authorized DiSabatino to begin work immediately after it received the construction permit.[26]  The parties did not jointly sign any contract documents before DiSabatino began working.[27]  The record indicates this was not entirely unusual as DiSabatino had previously started work on projects for the University without a signed contract, so long as DiSabatino obtained confirmation from the University.[28]

On June 5, 2017, DiSabatino submitted an executed short-form contract to the University.[29]  As noted above, the University had used the short-form contract in the past but had transitioned to using the three documents described in the Specifications.  The short-form contract that DiSabatino submitted stated that DiSabatino would complete the Project "in accordance with the conditions and prices . . . stated in the Proposal, the General Conditions, Supplemental General Conditions, and Special Conditions of the Contract."[30]  The short-form contract, therefore, referenced the AIA documents described in the Specifications, including the A201.  Additionally, DiSabatino executed a copy of the University's pre-drafted supplement to the A101 on June 2, 2017.[31]  When the University's project manager, Joseph Farah, received the

---

[24]  *Id.*, Ex. 10 (Email Dated June 27, 2017).
[25]  *Id.*, Ex. 3 at 26:22–27:4.
[26]  *Id.*, Ex. 3 at 28:17–29:5; *id.*, Ex. 2 at 28:10–28:12.
[27]  *Id.*, Ex. 2 at 28:5–20, 89:20–90:4.
[28]  *Id.*, Ex. 7 at 13:11–23.
[29]  *Id.*, Ex. 3 at 34:10–34:16.
[30]  *Id.*, Ex. 11 (Short-Form Contract).
[31]  *Id.*, Ex. 12 (Supplement)

4

short-form contract, he responded that DiSabatino should modify the "substantial completion date" to a date in July 2017.[32]

DiSabatino had almost completed the Project when a fire occurred in McKinly Hall on August 9, 2017.[33] After the fire, DiSabatino realized it had not received an executed contract from the University.[34] DiSabatino initiated correspondence to obtain executed contract documents, and then re-submitted the short-form contract and the supplement to the A101.[35] On August 15, the University requested that DiSabatino produce an A101 and A201 as soon as possible.[36] The University's intention was to execute the full AIA Contract retroactively.[37]

The University suggested that the retroactive AIA Contract should have a contract commencement date of May 31, 2017.[38] DiSabatino did not object. But then the University suggested modifications to terms of the AIA Contract relating to delay damages and other mark-ups.[39] DiSabatino refused, explaining it would not agree to modifications of substantive terms after the fact.[40] The University then agreed that the original AIA Contract terms, as included by the University in the Specifications, would remain in place.[41] The University never provided DiSabatino with an executed copy of the AIA Contract. DiSabatino did not ask the University to execute the AIA Contract because it "believed [they] were under contract," such that the "actual signature" seemed "superfluous."[42]

---

[32]  *Id.*, Ex. 13 (Email Dated June 6, 2017).
[33]  *Id.*, Ex. 6 at 93:1–93:9.
[34]  *Id.*, Ex. 7 at 18:15–19:7.
[35]  *Id.*; *id.*, Ex 19 (Email Dated Aug. 11, 2017).
[36]  *Id.*, Ex. 4 at 112:9–112:14.
[37]  *Id.*, Ex. 4 at 112:15–112:19.
[38]  *Id.*, Ex. 4 at 125: 3–9.
[39]  *Id.*, Ex. 20 (Email Dated August 29, 2017); *id.*, Ex 21 (Email Dated Sept. 5, 2017); *see also id.*, Ex. 2 at 49:1–49:12, 111:20–113:11.
[40]  *Id.*, Ex. 21; *id.*, Ex. 4 at 117:22–118:12.
[41]  *Id.*, Ex. 22 (Email Dated Sept. 18, 2017); *id.*, Ex. 2 at 114:24–115:10.
[42]  *Id.*, Ex. 2 at 87:7–87:16.

**D. THE UNIVERSITY AND DISABATINO ENTER INTO A TERMINATION AGREEMENT**

In November 2017, the University decided to terminate DiSabatino's engagement on the Project.[43] The University then drafted a Conclusion of Services Agreement ("COSA").[44] On November 8, 2017, the University emailed the COSA to DiSabatino, describing it as "an agreement that will facilitate a conclusion of our agreement."[45] The University requested an accounting of DiSabatino's work on the Project, which DiSabatino provided.[46] DiSabatino's accounting showed a contracting amount of $119,241.04.[47]

DiSabatino executed the COSA and submitted it to the University on January 17, 2018. DiSabatino understood the COSA as reserving the rights the parties had according to the AIA Contract.[48] DiSabatino did not view the COSA as modifying the AIA Contract.[49] DiSabatino maintains it would not have executed the COSA if the COSA modified the terms of the AIA Contract.[50] After DiSabatino signed the COSA, the University paid it $119,241.04.[51]

**E. RELEVANT TERMS OF THE AIA CONTRACT AND COSA**

The A101 incorporated the A201 as part of the "Contract Documents."[52] And Section 11.3.7 of the A201, titled "Waivers of Subrogation," reads as follows:

> The Owner and Contractor waive all rights against (1) each other and any of their subcontractors, sub-subcontractors, agents and employees, each of the other, and (2) the Architect, Architect's consultants, separate contractors described in Article 6, if any, and any of their subcontractors, sub-subcontractors, agents and employees, for damages caused by fire or other causes of loss to the extent covered by property insurance obtained pursuant to this Section 11.3 or other property insurance applicable to the Work, except such rights as they have to proceeds of

---

[43] *Id.*, Ex. 4 at 148:6–148:11.
[44] *Id.*, Ex. 24 (Email Dated Nov. 8, 2017).
[45] *Id.*
[46] *Id.*
[47] *Id.*, Ex. 25 (Letter Dated Dec. 4, 2017).
[48] *Id.*, Ex. 2 at 93:10–94:18.
[49] *Id*.
[50] *Id.*, Ex. 2 at 119:6–119:12, 121:3–121:9.
[51] *Id.*, Ex. 28 (Email Dated March 5, 2018).
[52] *Id.*, Ex. 29 at § 9.1.2 (AIA Documents Signed by DiSabatino).

such insurance held by the Owner ~~as fiduciary~~.[53] The Owner or Contractor, as appropriate, shall require the Architect, Architect's consultants, separate contractors described in Article 6, if any, and the subcontractors, sub-subcontractors, agents and employees of any of them, by appropriate agreements, written where legally required for validity, similar waivers each in favor of other parties enumerated herein. The policies shall provide such waivers of subrogation by endorsement or otherwise. A waiver of subrogation shall be effective as to a person or entity even though that person or entity would otherwise have a duty of indemnification, contractual or otherwise, did not pay the insurance premium directly or indirectly, and whether or not the person or entity had an insurable interest in the property damaged.[54]

Additionally, the COSA included a section titled "Non-Waiver and Reservation of Right by Owner," which reads follows:

Owner does not waive, and hereby reserves, all of its rights, claims, remedies and defenses against Contractor; any of its subcontractors and suppliers; and any other person(s) or entities for whom Contractor is liable or responsible arising from or relating in any way to the Fire, including, without limitation, all such rights, claims and remedies as may now or hereafter be vested in any property or casualty insurer of Owner, whether public or private, by reason of applicable law, including the principles of subrogation and/or indemnity.[55]

## F. THIS CIVIL ACTION

Plaintiffs filed their Complaint on August 8, 2019, seeking—through subrogation—to recover damages to the University resulting from the fire.[56] The Complaint asserts causes of action for negligence (Count I), negligence per se (Count II), breach of contract (Count III), and breach of the implied warranty of good quality and workmanship (Count IV).[57] Counts I, II, and IV are brought against all Defendants, while Count III is brought against DiSabatino alone.

Defendants moved to dismiss, arguing that the AIA Contract expressly waived subrogation claims.[58] After Plaintiffs filed their opposition, Defendants requested that briefing

---

[53] The University's Supplement strikes "as fiduciary." *See id.*, Ex. 5 at PLF000509.
[54] *Id.*, Ex. 18 (A201).
[55] *Id.*, Ex. 26 (COSA).
[56] Complaint at ¶¶ 19–20.
[57] *Id.* at ¶¶ 21–53.
[58] *See* D.I. Nos. 16, 19, 20.

on the motions to dismiss be stayed and that the Court allow discovery as to the operative contract.[59] The Court denied Defendants' request on December 10, 2019.[60] In response, Defendants withdrew their motions to dismiss and answered the Complaint.[61]

Following discovery, Defendants moved for summary judgment in July 2021.[62] The Court heard argument on December 21, 2021.[63] At the conclusion of the hearing, the Court took the motions under advisement.[64]

### III.    PARTIES' CONTENTIONS

Defendants argue that the AIA Contract is the operative agreement between the University and DiSabatino, and that because the AIA Contract included a waiver of subrogation, all Plaintiffs' claims are barred.[65] Defendants acknowledge that the parties never jointly signed the AIA Contract forms. Nevertheless, Defendants maintain the parties objectively manifested an intent to be bound by the terms of the AIA Contract.[66] Furthermore, Defendants argue that the COSA did nothing to modify the waiver of subrogation[67] and that the waiver is fatal to all claims against all Defendants.[68]

Plaintiffs advance several arguments in opposition. First, Plaintiffs argue that contract formation is a jury question.[69] Second, Plaintiffs claim there are factual issues on whether the parties objectively manifested an intent to be bound by the AIA Contract.[70] Plaintiffs maintain

---

59    *See* D.I. Nos. 27–28.
60    D.I. No. 35.
61    D.I. Nos. 40, 47, 52–53.
62    *See* D.I. Nos. 83–85.
63    D.I. No. 91.
64    D.I. No. 91.
65    DiSabatino's Mot. for S.J. at 20–25.
66    *Id.* at 22–25.
67    *Id.* at 25–27.
68    *Id.* at 28–33.
69    Plaintiffs' Answering Br. at 20–21.
70    Specifically, Plaintiffs cite a case from 1935 for the proposition that "[t]he question of whether an alleged contract was made is for the jury where, as here, a party introduces not only written evidence but also 'facts and circumstances tending to show that the parties, by their acts, had recognized existence of that contract.'" *Id.* at 21

8

that DiSabatino and the University had a "meeting of the minds" only on the essential terms of price and scope of work, but not on the form of their contract.[71]

Alternatively, Plaintiffs argue that even if the University and DiSabatino agreed to be bound by the AIA Contract, the COSA modified the AIA Contract to remove the waiver of subrogation. Plaintiffs also suggest that the waiver would be limited to certain parts of McKinly Hall and that it would not extend to DiSabatino's subcontractors and sub-subcontractors.

## IV.    STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled. The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[72] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[73] If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[74]

The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[75] If the motion is properly supported, then the burden shifts to

---

(quoting *Universal Prods. Co., Inc. v. Emerson*, 179 A. 387, 395 (Del. 1935). The Court will not dwell on this argument because Delaware courts routinely analyze contract formation under such circumstances on summary judgment. *See, e.g., Price v. State Farm Mut. Auto. Ins. Co.*, 2013 WL 1213292, at *6–7 (Del. Super. Ct. Mar. 15, 2013), *aff'd*, 77 A.3d 272 (Del. 2013) (finding, on summary judgment, that the plaintiff manifested assent to a settlement offer through his conduct).

[71]    Plaintiffs' Answering Br. at 28.

[72] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).

[73] *Id.*

[74] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244 at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").

[75] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1970) (citing *Ebersole*, 180 A.2d at 470).

9

the non-moving party to demonstrate that there are material issues of fact for the resolution by the ultimate factfinder.[76]

## V. DISCUSSION

Defendants' motions raise three main questions: (1) is the AIA Contract the operative contract between DiSabatino and the University; (2) if so, did the COSA modify the waiver of subrogation in the A201; and (3) if the waiver remains effective, what is the effect of the waiver on Plaintiffs' claims? For the reasons set out below, the Court holds that the AIA Contract is the operative contract between DiSabatino and the University; that the COSA did not modify the waiver of subrogation in the A201; and that the waiver bars all of Plaintiffs' claims against all Defendants. Accordingly, the Court grants Defendants' motions.

### A. THE AIA CONTRACT IS THE OPERATIVE CONTRACT

A valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchanged legal consideration.[77] At issue here is the first element: Did the parties intend for the AIA Contract to bind them? The Court finds that the University and DiSabatino did.

The question of intent "looks to the parties' intent to the contract as a whole, rather than analyzing whether the parties possess the requisite intent to be bound to each particular term."[78] Under Delaware law, "overt manifestation of assent—not subjective intent—controls the formation of a contract."[79] In applying this objective test, "the court reviews the evidence that the parties communicated to each other up until the time that the contract was signed—*i.e.*, their

---

[76] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).
[77] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (internal citations omitted).
[78] *See Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229 (Del. 2018).
[79] *Id.* (internal quotations omitted).

words and actions—including the putative contract itself."[80]   Where the putative contract is in the form of a signed writing, that document generally offers the most powerful and persuasive evidence of the parties' intent to be bound.[81]  "However, Delaware courts have also said that, in resolve this issue of fact, the court may consider evidence of the parties' prior or contemporaneous agreements and negotiations in evaluating whether the parties intended to be bound by the agreement."[82]  Furthermore, "[n]othing in the law of contracts requires that a contract be signed to be enforceable."[83]

The Court finds that the University and DiSabatino objectively manifested assent to using the AIA Contract as their contract.  The University initially invited DiSabatino to bid on the Project and provided the Specifications as a directive for the bid.  The Specifications said that a successful bidder would be "required to enter into" the "Contract."[84]  In the Specifications, a section titled "Contract" directed bidders to "*use A101 2007 and A201 2007* with the following supplemental information."[85]  In other words, the University expressly informed DiSabatino during bidding that the contract would be the AIA Contract.  DiSabatino agreed.  By signing the Bid Form included in the Specifications, DiSabatino certified that it understood the requirements detailed in the Specifications and that it would carry out the Project "in accordance with the Specifications . . . ."[86]  Therefore, the University and DiSabatino objectively manifested assent to using the AIA Contract during the bidding stage of their relationship.

---

[80]   *Id.* at 1229–30 (internal citations omitted).
[81]   *Id.* at 1230 (internal citations omitted).
[82]   *Id.* (internal citations omitted).
[83]   *See Whittington v. Dragon Grp. L.L.C.*, 2013 WL 1821615, at *3 (Del. Ch. May 1, 2013) (collecting cases); *see also* 17A Am. Jur. 2d Contracts § 174 ("Signature spaces in a form contract do not in and of themselves require that signatures of the parties are a condition precedent to the agreement's enforceability.").
[84]   DiSabatino's Mot. for S.J., Ex. 5 at PLF000468.
[85]   *Id.*, Ex. 5 at PLF000479.
[86]   *See id.*, Ex. 8.

11

The Court notes that the University and DiSabatino did not execute the AIA Contract as the Specifications required.[87] Nevertheless, the Court finds that their conduct after the University selected DiSabatino's bid manifests an intent to be bound by the AIA Contract. On June 2, 2017, DiSabatino executed a copy of the University's pre-drafted supplement to the A101.[88] The top of the first page again instructed the bidder to "[u]se A101 2007 and A201 2007 with the following supplemental information."[89]

On June 5, 2017, DiSabatino executed a copy of the University's short-form contract.[90] The record, however, demonstrates that DiSabatino made a mistake by signing the short-form contract as the Specifications did not call for the short-form contract and the University had ceased using it by this time. The Court finds that DiSabatino's mistake was harmless because the short-form contract said DiSabatino would complete the Project "in accordance with the conditions and prices . . . stated in the Proposal, the General Conditions, Supplemental General Conditions, and Special Conditions of the Contract . . . ."[91] In other words, DiSabatino expressly informed the University that it intended to follow the terms of the AIA Contract, including the A201.

In response, the University did not to inform DiSabatino that it had submitted the wrong form, nor did it take issue with DiSabatino's stated intent to follow the Specifications and the AIA Contract. Instead, the University simply asked DiSabatino to slightly alter the date of substantial completion.[92] The Court finds that a reasonable, objective third party in DiSabatino's

---

[87] *See id.*, Ex. 5 at PLF000468 ("Within five (5) days of receipt of the Contract, the successful Bidder shall execute the Contract and return it to the Owner for execution by the University. The Contract to be signed will be in the form included in the Bidding Documents.").

[88] *Id.*, Ex. 12.

[89] *Id.*

[90] *Id.*, Ex. 11.

[91] *Id.*; *see also id.*, Ex. 4 at 60:16–60:21 (Marcia Hutton acknowledging that the short form contract included the A201).

[92] *See id.*, Ex. 13.

12

position would interpret the University's response as implicitly approving DiSabatino's other statements in the short-form contract.[93]

The conduct of the parties after the fire provides the final proof of their intent. DiSabatino sent the University additional copies of the short-form contract and Supplement.[94] This time, the University (through Ms. Hutton) informed DiSabatino that it had submitted the wrong form:

> Thanks for delivering the contract Friday. Unfortunately it is not the format outlined in the bid documents for this particular project. This was a project that referenced the A101 2007 and A201 2007 and our supplemental information. Please produce that contract and submit as soon as possible.[95]

In other words, Ms. Hutton asked DiSabatino to sign and submit the AIA Contract as it was described in the Specifications. The only reasonable interpretation of Ms. Hutton's request is that the University regarded the AIA Contract as the operative contract between itself and DiSabatino. Otherwise, the University would have had no reason to ask DiSabatino to sign and submit it. DiSabatino did, as Ms. Hutton asked, submit the signed AIA Contract, thereby confirming its assent to being bound by its terms.

DiSabatino and the University objectively manifested an intent to be bound by the AIA Contract at each stage of their relationship. Pre-bidding, the University made clear through its Specifications that the contract would be the AIA Contract. DiSabatino agreed. After receiving the Project, DiSabatino told the University it would follow the Specifications. The University

---

[93] *See Corp. Service Co. v. Kroll Assoc., Inc.*, 2001 WL 755934, at *4 (Del. Super. June 15, 2001) ("When the offeree through his conduct leads the offeror to conclude that he has accepted the proposal, . . . the court will view silence as being tantamount to acceptance."). The *Kroll* court applied this principle in circumstances somewhat like the case now before the Court. In *Kroll*, an individual "clearly expressed to [the plaintiff] her expectations with respect" to the fees that plaintiff charged for certain services. *Id.* The individual's understanding of the plaintiff's fee structure was incorrect. But the plaintiff failed to correct her misunderstanding during a subsequent discussion, "the purpose of which was to clarify [the plaintiff's] pricing." *Id.* In this context, the *Kroll* court found that the plaintiff "objectively manifested [its] assent" to the individual's proposal with respect to the plaintiff's pricing. *Id.*
[94] DiSabatino's Mot. for S.J., Ex. 19.
[95] *See id.*, Ex. 20 at 3.

told DiSabatino to begin work. After the fire, the University asked that DiSabatino sign and submit the full AIA Contract. DiSabatino did so. Even if the University never ultimately signed the AIA Contract, both it and DiSabatino objectively manifested assent to using it as their contract. The undisputed facts allow no other conclusion, even when they are interpreted in Plaintiffs' favor. As a result, the parties agreed to be bound by the waiver of subrogation in the A201.

## B. THE COSA DID NOT MODIFY THE WAIVER OF SUBROGATION

Plaintiffs argue that even if the AIA Contract is operative, the COSA modified the waiver of subrogation in the A201.[96] The Court finds that Plaintiffs' interpretation is inconsistent with the COSA' plain and unambiguous language.

The COSA is a contract, and "[t]he proper construction of any contract . . . is purely a question of law."[97] The goal of contract interpretation "is to fulfill the parties' expectations at the time they contracted."[98] "But because Delaware adheres to an objective theory of contracts," the Court's interpretation must be intelligible to an "objective, reasonable third party."[99] To that end, the Court construes "clear and unambiguous terms according to their ordinary meaning."[100] Ambiguity exists only if the disputed language is "fairly or reasonably susceptible to more than one meaning."[101] Summary judgment cannot be granted if a disputed contract term is ambiguous.[102]

---

[96]  Plaintiffs' Answering Br. 29.
[97]  *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017) (internal citations omitted).
[98]  *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).
[99]  *Id.*
[100]  *Id.; see also Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language.") (internal quotation marks omitted).
[101]  *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).
[102]  *See, e.g., GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 783 (Del. 2012).

The relevant clause of the COSA was titled "Non-Waiver and Reservation of Right by Owner" and stated:

> Owner does not waive, and hereby reserves, all of its rights, claims, remedies and defenses against Contractor; any of its subcontractors and suppliers; and any other person(s) or entities for whom Contractor is liable or responsible arising from or relating in any way to the Fire, including, without limitation, all such rights, claims and remedies as may now or hereafter be vested in any property or casualty insurer of Owner, whether public or private, by reason of applicable law, including the principles of subrogation and/or indemnity.[103]

This clause does not purport to expand the University's rights or restore any rights that the University previously waived. Instead, the clause provides that the University "does not waive" and "reserves" its rights "as may now or hereafter be vested . . . ." As discussed above, the Court held that the University had previously waived the right of subrogation by agreeing to be bound by the AIA Contract. Nothing in the COSA can reasonably be interpreted as changing that.

The Court's conclusion is consistent not only with the plain language of the COSA, but also settled law regarding non-waiver clauses. The purpose of non-waiver clauses "is generally to ensure that a party to a contract is given an opportunity to make a thoughtful and informed decision about whether or not to enforce a particular contract right."[104]

> "Moreover, with regard to commercial contracts entered into between legal entities that can only act through authorized agents, they ensure that a contracting party will not lose its rights due to spontaneous words and acts of corporate agents. In this sense, non-waiver clauses serve to inform the other contracting party that no individual agent has the authority to waive or alter contract terms. Rather, they make clear that some official act is required in order to actually change the original agreement."[105]

As the law instructs, non-waiver clauses generally are not understood as expanding the rights of a party, but rather ensuring those rights are not reduced.

---

[103]   *Id.*, Ex. 26.
[104]   *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *27 (Del. Ch. Apr. 2, 2007).
[105]   *Id.*

15

The Court's conclusion does not change because the non-waiver clause in the COSA referred to the "principles of subrogation." The Court notes that "laundry list" of rights is general and not specific. The language illustrates the rights preserved, if any, and does not purport to expand or create new rights between the parties. In short, the COSA did not change the fact that the University had previously waived the right of subrogation.

## C. THE WAIVER OF SUBROGATION EXTENDS TO ALL DAMAGES

The fire in McKinly Hall damaged both the areas that Defendants were renovating for the Project and other areas, which were not part of the Project. Plaintiffs argue the waiver of subrogation should apply only to damages associated with the Project, and not to the non-Project areas.[106] This argument rests on Plaintiffs' interpretation of the A201 and various cases, including *St. Catherine of Sienna Catholic Church v. J.R. Pini Electrical Contractors Inc.*[107]

The Court, however, rejected this very argument in *St. Paul Fire & Marine Ins. Co. v. Elkay Mfg. Co.*[108] In *Elkay Mfg. Co.*, the Court noted that *St. Catherine* had recognized a distinction between "work" and "non-work" areas for purposes of the waiver of subrogation in the A201.[109] However, the Court distinguished *St. Catherine* on the grounds that it addressed an earlier version of the A201.[110] The A201 had since been updated in a way that "effectively extended the waiver of subrogation to non-work areas which have been covered by separate property insurance."[111] The Court therefore rejected an argument similar to the one Plaintiffs make now.

---

[106] *See* Plaintiffs' Answering Br. at 30.
[107] 2000 WL 1211146 (Del. Super. Ct. June 27, 2000), *aff'd*, 781 A.2d 695 (Del. 2001).
[108] 2003 WL 139775, at *6 (Del. Super. Ct. Jan. 17, 2003).
[109] *Id.*
[110] *Id.*
[111] *See id.* (distinguishing the 1987 version of the A201 from earlier versions).

16

Plaintiffs appear to recognize that *Elkay Mfg. Co.* is unfavorable and suggest in a footnote that it was wrongly decided.[112]  Plaintiffs are not alone in arguing that the A201 should be interpreted as waiving subrogation only for damage to work property.[113]  However, a recent review of the case law by the Fifth Circuit concluded this is the "minority approach."[114]  Conversely, the decision in *Elkay Mfg. Co.* is consistent with the "majority approach."[115]  The Court is therefore satisfied with and adopts the reasoning in *Elkay Mfg. Co.*

The University and DiSabatino used a version of the A201 that contains the same relevant terms as the version addressed in *Elkay Mfg. Co.*[116]  Moreover, it appears undisputed that the non-work areas of McKinly Hall were separately insured.  The waiver therefore extends to those areas as well.

## D. THE WAIVER OF SUBROGATION EXTENDS TO ALL DEFENDANTS

Schlosser and Guerrazzi were not parties to the AIA Contract.  As such, Plaintiffs argue the waiver would extend to them only if they were third-party beneficiaries of the agreement between the University and DiSabatino.[117]  The University's supplementary conditions in the Specifications disclaims any intent "confer upon any third party, including any of the Contractor's Subcontractors . . . the rights of a third party beneficiary."[118]  Plaintiffs therefore contend that the subrogation waiver does not reach Schlosser and Guerrazzi.

---

[112]  Plaintiffs' Answering Br. at 33 n.16 (arguing that *Elkay* "did not consider Section 11.3.7 in the broader context of the A201-2007, including Sections 3.18.1 and 11.1.1").
[113]  *See Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, L.L.C.*, 934 F.3d 424, 427–428 (5th Cir. 2019).
[114]  *See id.*
[115]  *See id.* at 427 (collecting cases); see also *see also Liberty Mut. Fire Ins. Co. v. Fowlkes Plumbing, L.L.C.*, 290 So. 3d 1257 (Miss. 2020) (answering the Fifth Circuit's certified question by adopting the majority approach).
[116]  *Elkay Mfg. Co.* involved the 1987 version of the A201, while this case deals with the 2007 version of the A201; however, the sections containing the subrogation waiver and the same in both versions.
[117]  Plaintiffs' Answering Br. at 33.
[118]  *Id.* at 34 (internal citation omitted).

The waiver in the A201 expressly states that the "Owner and Contractor waive all rights against (1) each other *and any of their subcontractors, sub-subcontractors*, agents and employees, each of the other . . . for damages caused by fire or other causes of loss . . . ."[119]  This language unambiguously means that the waiver extends to Schlosser and Guerrazzi.  The Court finds that an argument to the contrary is an unreasonable interpretation of the unambiguous language of the operative document.

## VI.     CONCLUSION

For the foregoing reasons, the Court holds that the AIA Contract is the operative contract between the University and DiSabatino, and that the parties are bound by the waiver of subrogation therein; that the COSA did not affect the waiver; and that the waiver extends to all damages associated with the fire and all Defendants.  Accordingly, Defendants' motions for summary judgment are **GRANTED**.


Dated: March 17, 2022
Wilmington, Delaware


/s/ Eric M. Davis
Eric M. Davis, Judge

cc: File&ServeXpress

---

[119]    DiSabatino's Mot. for S.J., Ex. 18.